## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANNIE ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03 C 6818 |
| | ) |
| JO ANNE B. BARNHART, | ) Magistrate Judge Jeffrey Cole |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

This case involves a review of the final decision of the Commissioner ("Commissioner") of

the Social Security Administration ("Agency") denying Ms. Rogers' application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §

1382c(a)(3)(A). Ms. Rogers seeks a reversal and remand of the Commissioner's decision, while the

Commissioner seeks an order affirming the decision. For the following reasons, the plaintiff's

motion is denied and the Commissioner's motion is granted.[1]

### I.
### INTRODUCTION

The system of judicial review carefully crafted by the Congress necessarily reposes

substantial discretion in the administrative law judge to make the threshold determination of witness

credibility and issues of fact and application of law to fact. *Cf. Sarchet v. Chater*, 78 F.3d 305, 308-

---

[1] This opinion replaces that issued on July 21, 2006. The briefing in this case was completed on
July 6, 2004. However, the case was not assigned to me until May 2005, at the time of my
appointment as a magistrate judge, along with a full calendar of other cases that had been reassigned
from other magistrate judges.

309 (7th Cir. 1996).[2] In reviewing the opinions of an administrative law judge in granting or denying

social security benefits, the question is always whether the decision of the ALJ is supported by

substantial evidence. If it is, the findings of the ALJ are "conclusive," and the decision must be

affirmed. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind

might accept to support a conclusion. A court may not reweigh the evidence or substitute its

judgment for that of the Social Security Administration. Resolution of conflicts in evidence is for

the Commissioner. *White v. Barnhart*, 415 F.3d 654 (7th Cir.2006).

But deference is not obeisance. In order for the court to affirm an ALJ's denial of benefits,

the ALJ must have articulated the reasons for his decision and clearly expressed the reasoning

process that led from the evidence to the ultimate conclusion. *Cf.* 42 U.S.C. §405(b); 20 C.F.R.

404.1527(d)(2), 416.927(d)(2).[3] Requiring administrative law judges to explain their conclusions

is a recognition that administrative law judges are not exempt from the requirement that applies to

courts at all levels of the federal system, namely that judicial decisions should not be based on some

ineffable intuition or unarticulated hunch. *Cf.* Henry M. Hart, Jr., *Foreword: The Time Chart Of The

Justices*, 73 Harv.L.Rev. 84, 98-99 (1959)("In the end, however, *ipse dixits* are futile as instruments

---

[2] According to the Social Security Administration's data on Disability Determination and Appeals for fiscal 2005, there were approximately 2,570,831 initial claims and 1,518,235 continuing disability reviews. Of the initial claims, ALJ's reviewed approximately 509,390 and granted benefits in approximately 62% of the cases, while dismissing 13% and denying benefits in 24%. The Appeals Council reviewed 89,499 new applications and granted benefits in an additional 2% of the cases, but remanded 25%, and denied benefits in 74%. The remaining 2% were dismissed. Of the 4,000,000 initial applications and continuing disability reviews done by the Social Security Administration in fiscal 2005 federal courts saw only 12,360 cases or 0.3% . Of this number, there was a remand in 45% of the cases, a denial in 42% of the cases, allowance in 5%, and a dismissal in 8%.

[3] *Compare* SSR 96-7p (findings on credibility cannot be based "on an intangible or intuitive notion about an individual's credibility"; they must be "grounded in the evidence and articulated in the determination or decisions.").

2

for the exercise of 'the judicial Power of the United States.'"); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171 (1951)(Frankfurter, J., concurring)("The validity and moral authority of a conclusion largely depends on the mode by which it was reached.").[4]

In the instant case, the ALJ did precisely what the law mandated she do: In a careful, 20-page opinion, she meticulously reviewed and analyzed the wealth of medical evidence in the case – that which favored Ms. Rogers, as well as that which did not, *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) – and she carefully explained the reasoning that underlay her conclusions, including why she discounted the opinion of Ms. Roger's treating physician. There were no illogical or erroneous statements by the ALJ like those that have occurred in some cases and which demonstrated the invalidity (or absence) of reasoning by the ALJ. *See, e.g., Sarchet*, 78 F.3d at 306.[5] The record in

---

[4] The requirement that judicial decisions be supported by articulable reasoning finds frequent expression. *See e.g., Szmaj v. AT&T*, 291 F.3d 955, 956 (7th Cir. 2002)(criticizing case as "weak authority" because no discussion, only conclusions); *NLRB v. Indianapolis v. Mack Sales & Service*, 802 F.2d 280, 284 (7th Cir. 1986)(criticizing NLRB's decision as consisting of "unadorned conclusions"); *United States v. Eiselt*, 988 F.2d 677, 680 (7th Cir. 1993)(judge must give reasons for downward departure). *Compare General Electric v. Joiner*, 522 U.S. 136, 146 (1997)(expert opinion must be connected to data by more than the expert's *ipse dixit*); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005)(expert cannot rely on intuition, must give reasons).

Justice Stone put it this way:

> I can hardly see the use of writing judicial opinions, unless they are to embody methods of analysis and of exposition which will serve the profession as a guide to the decision of future cases. If they are not better than an excursion ticket, good for this day and trip only, they do not serve even as protective coloration of the writer of the opinions and would much better be left unsaid. Letter from Justice Stone to Felix Frankfurter quoted in A. Mason, The Supreme Court From Taft To Warren, 105-106 (1958).

[5] In *Sarchet*, the comments of the Administrative law judge demonstrated a significant misunderstanding of the plaintiff's disease, a shaky understanding of the medical facts, a significant misapprehension of the claimant's testimony which led to a flawed assessment of her credibility, and a number of unfounded sociological speculations, which led the ALJ to conclude that Ms. Sarchet's lack of work history necessarily stemmed from a lack of interest in employment rather than from the long list of medical ailments from which she suffered and which were "[i]gnored" by the ALJ. 78 F.3d at 306-07.

this case is more than adequate to allow a reviewing court to assess the overall validity of the ALJ's findings and the logical connection between the evidence and her conclusions and to afford the plaintiff a meaningful judicial review.

The same care and balance exhibited by the ALJ in evaluating the medical evidence was exercised by the ALJ in evaluating Ms. Rogers' credibility. Ms. Rogers testified that her noncompliance with her medical regimen stemmed from her lack of bus fare to go to the hospital to have her prescriptions refilled. This testimony bore on a significant issue: Failure to follow a prescribed course of remedial treatment without good cause can be grounds for denying an application for benefits, 20 C.F.R. §416.930(a) and (b); *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *Kisling v. Chaper*, 105 F.3d 1255, 1257 (8th 1997), and can weigh against a claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

"[O]f course, the Administrative law judge did not have to believe" Ms. Rogers, *Sarchet,* 78 F.3d at 307, or accept her testimony at face value. Under the Social Security Act, administrative law judges are not inert and wooden participants in an empty ritual, the preordained end of which is to award benefits to those in distress, regardless of whether they qualify under the Act. The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. Administrative law judges are functionally comparable to Article III judges, *Clevenger v. Saxner*, 474 U.S. 193, 201 (1985); *Tennessee Student Association v. Hood*, 541 U.S. 440, 457 (2004), and thus, there is nothing inappropriate about an ALJ's questioning of a witness to gauge the truthfulness of testimony. Indeed, in the non-adversarial setting of a social security hearing there is no one else to perform that indispensable task, and questioning witnesses is consistent with and demanded by the ALJ's basic

4

obligation to develop a full and fair record and to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his or her entitlement to benefits. *Cf. Heckler v. Campbell* 461 U.S. 58 (1983); *Johnson v. Barnhart*, 449 F.3d 804 (7th Cir. 2006); *Madrid v. Barnhart*, 447 F.3d 788 (10th Cir. 2006).[6]

Thus, the ALJ asked Ms. Rogers if she could have borrowed bus fare from a member of her family. This simple inquiry underlies the contention that the ALJ was insensitive to the plight of the poor and that she used Ms. Rogers' poverty against. (*Plaintiff's Memorandum* at 17).[7] If true, the allegation could scarcely be more serious. If false, it could scarcely be more irresponsible. As discussed in greater detail below, the evidence would lead inexorably to the conclusion that Ms. Rogers' testimony was false and was designed to conceal her long-standing cocaine habit (R. 327, 403-417) so as to avoid potential application of the prohibitions against an award of benefits where a claimant has failed to follow medical treatment or where a claimed disability is linked to drug addiction. 42 U.S.C. §423(d)(2)(C). In short, far from demonstrating an insensitivity on the part of the ALJ to the plight of the poor, the record reveals a calculated attempt to deceive the ALJ.[8]

---

[6] Even in the context of a jury trial, questions by the court are perfectly permissible. *See* Rule 614(b), Federal Rules of Evidence. What is impermissible is questioning that conveys to the jury the impression that the court has a fixed and unfavorable opinion of a party and its position. *See, e.g., Rivas v. Brattesani*, 94 F.3d 802,807-808 (2d Cir. 1996); *Nationwide Mutual Fire Insurance v. Ford*, 174 F.3d 801,805 (6th Cir. 1999). *Cf. Zapata Hermanos Sucesores v. Hearthside Baking Co.*, 313 F.3d 385, 392 (7th Cir. 2003).

[7] The companion argument that ALJ's failure to say in her Decision that Ms. Rogers' admitted noncompliance with her prescribed course of treatment stemmed from her poverty begs the question and is, ultimately, wrong.

[8] Social security claimants cannot draw a conjurer's circle around their testimony by claiming poverty, and lying is no more palatable or permissible in a social security hearing than in any other context. *Cf. Alsagladi v. Gonzales*, 450 F.3d 700, 701 (7th Cir. 2006); *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005)("The legal system offers many ways to deal with problems; perjury is not among them.").

What is disturbing about the allegations against the ALJ are not their lack of merit. There is nothing unusual about lawyers including feckless arguments that actually detract from the presentation of the case. *See, e.g., United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Walker v. Abbott Laboratories*, 416 F.3d 641, 643 (7th Cir. 2005); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006). The more troubling aspect of the argument is its resort to the "ostrich-like tactic" of pretending that critical components of the record essentially do not exist. That tactic is as "unprofessional . . . [and] pointless" as ignoring potentially dispositive authority that is contrary to one's contentions. *Hill v. Norfolk & Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987). Indeed, in some ways it is even more so.

## II.
## PROCEDURAL HISTORY

Plaintiff has filed three applications for Supplemental Security Income. The first was denied after a hearing in September of 1996, and she did not seek review of that decision. (Administrative Record ("R.") at 22). In her second application, filed on September 17, 1999, the plaintiff claimed that he had been disabled since August 29, 1999, due to high blood pressure, bleeding ulcer, asthma, and arthritis. (R.150-51, 181). The Agency denied this application on November 4, 1999 (R. 115-118), and plaintiff chose not to seek reconsideration. Instead, she filed a third application on March 1, 2000. (R. 152-53).[9] This application was denied at the both the initial level of administrative review (R. 119-22), and upon reconsideration. (R. 125-27). Plaintiff requested an administrative hearing. (R. 128-29).

---

[9] Because the plaintiff filed this most recent application within 12 months of the November 1999 denial, the ALJ was able to reopen the previous application and consider evidence from it pursuant to 20 C.F.R. §§ 416.1487-416.1488.

6

On March 13, 2002, an administrative law judge conducted a hearing at which plaintiff, represented by counsel, appeared and testified. (R.45-111). In addition, Richard Hamersma testified as a vocational expert. (R. 45, 101-10). In a decision dated October 22, 2002, the ALJ found that plaintiff was not disabled because she retained the ability to perform a range of unskilled, light work. (R.22-41). This became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the decision on August 7, 2003. (R. 7-9). *See* 20 C.F.R. §§ 416.1455; 416.1481. Plaintiff has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## III.
## THE EVIDENCE ADDUCED AT THE HEARING

The plaintiff was born on December 12, 1949. She was fifty-two years old at the time of the ALJ's decision. (R. 152). She is 5' 1" and weighs 176 pounds. (R. 345). She has a seventh-grade education (R. 72-73). Plaintiff is able to write her name, read a grocery list, and make change (R. 73), but claims difficulty in reading "a lot of words" in the newspaper. (R. 73). She worked part-time as a housekeeper from 1995 to 1999 (R. 182), and as a baby-sitter in 1999. (R. 181). In 2000 she worked in housekeeping at a hotel. (R. 344).

She testified under oath – falsely as it turned out – in conformity with her lawyer's representation to the ALJ, that she had been drug-free for at least 15 years, and that her 19-day stay at the Haymarket Center in May 2002 had absolutely nothing to do with drug addiction and related only to her problems with alcohol. (R. 54, 96). She admitted to a 3-pack-a-day cigarette habit for 35 years and to being an alcoholic for as many years and to purchasing alcohol on a daily basis. (R. 61, 252). These addictions were in place during the period that she claimed that she could not get

7

to the hospital to refill her prescriptions because she lacked bus fare. (R. 67, 84-85, 353). These addictions were also in place when Ms. Rogers claimed that she had to quit her babysitting job because she did not have bus fare. (R. 84-85).

## A.
## The Medical Evidence

The relevant medical evidence dates from July 27, 1999, when plaintiff was treated in the emergency room of Provident Hospital of Cook County for some shortness of breath, a cough, and intermittent abdominal pain (R. 240).[10] She was initially diagnosed with asthma, peptic ulcer disease, and athlete's foot. (R. 240). A chest x-ray revealed mild interstitial lung density – calcified lymph nodes – and old granulomatous disease without significant change from a previous study in March of 1998. (R. 247-51). The discharge diagnosis was asthma exacerbation, indigestion (dyspepsia), and athlete's foot (R. 242).

Plaintiff returned to Provident Hospital for a scheduled follow-up visit at the Sengstacke Clinic on September 8, 1999. (R. 242, 244). She complained of constipation and said she was occasionally dizzy and saw spots. (R. 244). Her blood pressure was 160/104. (R. 244, 310). The assessment was hypertension, chronic obstructive pulmonary disease or asthma, peptic ulcer disease, and athlete's foot. (R. 245). When plaintiff returned to Sengstacke Clinic for her next follow-up visit on September 15, 1999, she initially complained that she had lost the strength in her hand; later she said she had "stiffness of hands, but no further complaints." (R. 243).

---

[10] As often occurs in these cases, the medical record is somewhat disorganized and often illegible. An added factor that is not generally seen is that the medical record does not pertain just to the plaintiff, but to other individuals as well. At least fourteen pages of clinical notes refer to an African-American man in his mid-fifties. (R. 312-22, 339-41). Others refer to a sixty-five-year old woman. (R. 392-93). Those would appear to be the only instances of irrelevant information being made part of the record.

8

The Agency arranged for Dr. Angelito Bernardo to perform a consultative examination on October 20, 1999. (R. 252-64). Plaintiff related a history of high blood pressure, breathing difficulties, and pain in her back and right hip. (R. 252). She admitted to having been a three-pack-a-day smoker for thirty-five years, but added that she had recently cut down to about a third of a pack per day. (R. 252). She also informed the doctor that she had been treated for a bleeding ulcer in 1998, but had not had an episode since then. (R. 253). Plaintiff's blood pressure was 130/90. (R. 253). Abdominal exam was normal. (R. 254, 255). Dr. Bernardo reported that he could hear wheezing when plaintiff spoke or exhaled. (R. 253-54). A pulmonary function study yielded a forced vital capacity of 2.40 liters and a forced expiratory volume of 1.80 liters in one second – both about 95% of predicted values, with improvement after bronchodilators were administered. (R. 258, 260).

Dr. Bernardo also reported tenderness of the right hip area with decreased range of motion because of pain. (R. 254). Plaintiff's gait was mildly antalgic and she had some difficulty walking 50 feet, walking on her toes, walking on her heels, tandem walking, squatting, and rising. (R. 254). An x-ray of the right hip was normal. (R. 264). Her grip strength, and gross and fine dexterity were said to be normal bilaterally. (R. 254). Dr. Bernardo felt that plaintiff "may have chronic obstructive pulmonary disease (COPD) with her symptomatology." (R. 255). He also noted a history of hypertension, chest pain, ulcer, and right hip joint pain. (R. 255).

On January 12, 2000, plaintiff returned to the Provident Hospital ER complaining of sharp pains in the left side of her chest. (R. 265). Her medical history was noted to be positive for hypertension and lung disease. (R. 265). Upon examination, there was chest wall tenderness, but

9

no wheezing, rales, or rhonci.[11] (R. 265). A chest x-ray showed a left posterior lung lesion and "CA left hilar node."[12] (R. 265). On discharge, plaintiff was advised to take Tylenol as needed. (R. 265). On February 9, 2000, plaintiff went to Sengstacke Clinic with complaints that included periodic joint stiffness lasting 30-60 minutes periodically throughout the day, as well as occasional chest discomfort and lower back stiffness. (R. 309). Blood pressure was 152/76. (R. 309). Plaintiff returned to the Provident Hospital ER on February 11, 2000, to for PPD[13] test results. (R. 266, 268). It was noted to be reactive and plaintiff was told to return in a week. (R. 268).

The next week, plaintiff reported that Pepcid had helped with her gastrointestinal symptoms, although on examination there was slight epigastric pain with deep palpation. (R. 304-05). Her hypertension was "uncontrolled" with a blood pressure reading of 176/106 (R. 304), and her glucose level was elevated. (R. 305). The positive PPD was noted, as were plaintiff's calcified nodes. (R. 305). Both diabetes and sarcoidosis needed to be ruled out.[14] (R. 305).

Plaintiff returned to the Sengstacke Clinic on March 15, 2000, complaining of joint pain and swelling in her right thumb. This was accompanied by stiffness, which was worse in the morning.

---

[11] Rales and rhonci are abnormal breath sounds; rales sound like crackling while rhonci sound like snoring. www.mercksource.com.

[12] "Calcified" bronchopulmonary lymph node; lymph node embedded in the root of the lung, mainly at the hilum – a depression or pit at the part of an organ where vessels and nerves enter. This is essentially unchanged from the previous study of July of 1999. www.mercksource.com.

[13] PPD is purified protein derivative, used in skin tests for tuberculosis. www.mercksource.com.

[14] Sarcoidosis is a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles in almost any organ or tissue. In cases of severe lung disease, the skin is frequently affected by sarcoidosis, often starting as raised, tender, red lumps. www.mercksource.com.

There was some limitation of movement noted. Tylenol was recommended. Her blood pressure was normal at 119/80. (R. 294-295).

On March 22, 2000, Dr. Nelson – who examined plaintiff at the Sengstacke Clinic a week earlier, completed a series of forms for the Agency. (R. 269-76). He noted a diagnosis of asthma, hypertension, arthritis, and peptic ulcer disease. (R. 269). The doctor graded plaintiff's grip strength and gross and fine manipulation as 5/5 in the left hand but only 1/5 in the right hand. (R. 269). In addition, he reported that plaintiff had "poor pincer grasp and fine manipulation," in her right hand. (R. 270). Dr. Nelson stated that plaintiff was unable "to use hands for fine movement, pincer grasp and manipulation of objects. Hence, this impairs her activities in daily living." (R. 272). In the respiratory section of the forms, Dr. Nelson noted wheezing and that x-rays from February 11, 2000, had shown calcified nodes and mild interstitial lung disease. (R.271). He did not indicate that this affected her ability to perform work-related activities. (R. 271). He reported that plaintiff's hypertension was essentially asymptomatic. (R.273-76).

On March 28, 2000, Dr. E.C. Bone, an Agency physician, reviewed the medical record. (R. 232-239). He found that plaintiff could essentially perform light work, but was limited in her ability to grasp or perform fine manipulation with her right hand. (R. 233). He felt plaintiff could never climb or crawl, and should avoid concentrated exposure to pulmonary irritants and work around hazardous machinery and heights. (R. 236).

Plaintiff was treated for contact dermatitis on July 5, 2000. (R. 277-79). At that time her blood pressure was 124/80. (R. 278). She returned to the clinic on August 9, 2000, complaining of peeling and itchiness of both feet. (R. 302). She also said she always felt thirsty. (R. 302). She had run out of medication and wanted a refill. (R. 302). Treatment notes indicated there were scaly

11

lesions on plaintiff's feet. (R. 303). Her blood pressure was elevated at 156/100. (R. 302). The assessment was hypertension, peptic ulcer disease (PUD), arthritis, athlete's foot, COPD/asthma and complaints of polydipsia with diabetes needing to be ruled out (R. 303).

Plaintiff was at the clinic once again on September 6, 2000, this time complaining of shortness of breath when she walked, a headache, and dizziness. (R. 298). She also said she would cough during the night, waking her from sleep three to four times a week. (R. 298). This had been worse the week before. (R. 298). The assessment was essentially unchanged: hypertension, PUD, arthritis, COPD/asthma, and diabetes mellitus that needed to be ruled out. (R. 299-300). Along with these clinical notes was a comment from Dr. Nelson:

> Patient Annie Rogers is under my care for Asthma, COPD, Hypertension, Arthritis, and Peptic Ulcer Disease. Her arthritis is oftentimes quite disabling. She is under medical therapy and physical therapy. The patient is using various inhalers for Asthma care and therapy.

(R. 301). Plaintiff's medications were then listed as: Celebrex, Maalox, Adalat and HCTZ, Pepcid, and Combivent MDI. (R. 301).

Plaintiff went to the clinic again on October 25, 2000. (R.. 289-90). She had again run out of medication. She complained of shortness of breath at night and when she walked. (R. 289). Her blood pressure was 168/103. (R. 289). She also complained of a severe headache and some blurred vision. (R. 289). The assessment was diabetes mellitus type 2, hypertension, PUD, asthma, and arthritis (R. 290). An upper gastro-intestinal study on November 17, 2000, was consistent with mild gastritis. (R. 297).

By December 13, 2000, plaintiff had again run out of some of her medications and returned to the clinic for a refill. (R. 287). She complained of dizziness. (R. 287). Her blood pressure was

stable at 115/62. (R. 287-88). She was given extra strength Tylenol for her arthritis, Prevacid for her gastrointestinal complaints, and Albuterol and Atrovent for her COPD. (R. 288).

On April 10, 2001, plaintiff went to Provident Hospital's ER because she had again run out of blood pressure medication and experienced some dizziness (R. 282). Blood pressure was 140/78. (R. 283). Her medication was refilled (R. 283) and 1-2 days of bed rest was recommended. (R. 284). Plaintiff returned on April 20, 2001, complaining of lightheadedness and an episode of nose bleeding. (R. 329). There was no diabetic reaction, headache, or dizziness. (R. 329). Blood pressure was 126/87. (R. 331). The discharge diagnosis was hyperglycemia. (R. 332).

On May 11, 2001, plaintiff went to Provident Hospital for "routine diabetic foot care" and it was noted that she had been living in a homeless shelter for the past two months (R. 326-27). It was also noted that plaintiff reported she had recently quit drinking and *had a history of cocaine abuse*. (R. 327)(Emphasis supplied). Two days later, plaintiff checked into the Haymarket Center's in-patient program for cocaine and alcohol addiction. (R. 397). She again reported cocaine abuse and explained in detail the extent of her habit: she reported spending about $40 a day on cocaine over the previous year and $100 a day in prior years. (R. 405). She spent about $8 a day on alcohol. (R. 405). She reported she last used cocaine *and* alcohol on May 8, 2001. (R. 405). She claimed to have experienced blackouts for fifteen years. (R. 405). She also reported having been homeless for about ten months (R. 409). She was diagnosed both at the time of admission and at the time of release, as suffering from cocaine and alcohol dependency. (R. 407).

Plaintiff spent about three weeks undergoing "intensive residential treatment"at the facility (R. 416-17). Upon discharge to a recovery facility, no significant medical findings were noted. (R.

13

416). The medical professionals concluded that she did not need psychiatric evaluation or treatment. (R. 31). The diagnoses were confirmed by a physician. (R. 31).

On May 24, 2001, while still at Haymarket Center, plaintiff began seeing Dr. Lori Riley at Cook County Hospital's clinic. (R. 356, 364). At that time, plaintiff's blood pressure was stable but her diabetes was not well-controlled. (R. 355). Dr. Riley added a diabetes medication to plaintiff's regimen. (R. 355). Dr. Riley's treatment notes from August 7, 2001, reported that plaintiff had acute sinusitis, asthma with wheezing, and a skin rash of unknown etiology for which she prescribed Prednisone. (R. 357). On August 28, 2001, Dr. Riley noted that plaintiff's diastolic blood pressure was mildly elevated at 120/100, and that, once again, her type 2 diabetes was not well-controlled. (R. 355). Plaintiff explained to Dr. Riley that her finances were limited and that she had to eat what was available at her son's home. (R. 355). The doctor also referred plaintiff to the eye clinic for her complaint of blurred vision. (R. 354).

On December 7, 2001, plaintiff returned to the Cook County Hospital clinic and reported that she had lost consciousness after "sneezing in rapid succession." (R. 353). Dr. Riley noted that plaintiff's blood pressure was well-controlled at 130/78 despite lack of medication, although Dr. Riley thought the loss of consciousness might have been due to uncontrolled blood pressure "since [she was] not compliant with meds." (R. 353). Plaintiff's asthma was "moderately well controlled," although, again, plaintiff had run out of medication. (R. 353). Dr. Riley reported that plaintiff's diabetes was poorly controlled, noting "social problems have impacted dietary adherence." (R. 353). What these problems were, Dr. Riley chose not to say. She complained of having difficulty getting to the clinic, and Dr. Riley referred her to transportation services. (R. 353).

14

The Agency arranged for plaintiff to be examined by Dr. Paul Belich, an orthopedist, on December 11, 2001. (R. 344-50). Dr. Belich examined Ms. Rogers and reviewed the material provided by the Bureau of Disability Determination Services. Plaintiff reported that her chief complaints were arthritis in both hips and both hands, and related her history of ulcers, hypertension, diabetes, and asthma. (R. 344). She also reported that she took numerous medications, including extra strength Tylenol for her arthritis, although she was not on any medications for arthritis at the time of the examination. (R. 344-345).

Dr. Belich reported that plaintiff was appropriate, polite, pleasant and cooperative. Her affect was normal and there were no signs of depression or anxiety. Her gait was non-antalgic, and that her hips showed no signs of tenderness. He reported that range of motion in the hips was essentially symmetrical: 95 degrees of flexion, 45 degrees of external rotation, 15 degrees of internal rotation, 50 degrees abduction, 25 degrees abduction. There was mild tenderness in the base of plaintiff's right thumb, as well as bony prominence in the area. Nevertheless, Dr. Belich reported that plaintiff had good hand grips bilaterally and was able the make closed fists, and open and close her hands without any difficulty. (R. 345).

Dr. Belich's impression was chronic hip and knee pain without clinical evidence of degenerative arthritis and basilar joint arthritis of the right thumb. (R. 346). According to the doctor, plaintiff had no limitations whatsoever from lifting, carrying, standing, walking, sitting, pushing, or pulling: in fact, he thought she could lift and carry 100 pounds or more, and could stand and walk for six hours during an eight-hour workday. (R. 347-48). He did, however, report that plaintiff could only occasionally climb, balance, kneel, crouch, crawl, and stoop. (R. 348). He further reported that plaintiff had unlimited ability to reach, handle, finger and feel with both hands.

15

(R. 349). Finally, despite noting plaintiff's history of asthma, Dr. Belich reported that plaintiff had no environmental limitations, i.e., no restrictions as to temperature extremes, humidity, hazards, fumes, odors, chemicals or gases. (R. 350).

On December 11, 2001, plaintiff underwent an x-ray of her right hand after complaining of pain for two weeks. (R. 351). The study revealed mild degenerative osteoarthritic changes at the first metacarpal and first metacarpal joint. (R. 351). The remainder of the bones of the hand were normal. (R. 351).

Plaintiff returned to see Dr. Riley on March 1, 2002, complaining of pain in her leg muscles, numb fingers, and "tingling on tips of fingers on [left] hand." (R. 352). Plaintiff's blood pressure was 172/100, and Dr. Riley noted that her hypertension was uncontrolled but there were no symptoms. (R. 352). Dr. Riley also noted that plaintiff's diabetes was not well controlled, and that she was experiencing symptoms of neuropathy and polyuria. (R. 352). Plaintiff reported experiencing asthma symptoms on a daily basis, which were triggered by strong odors, cold air, dust, and cat and dog dander. (R. 352). Her medication at that time included Combivent, Albuterol, and Aerobid (asthma), HCTZ and Captopril (hypertension), Acetominophen ES, and Metformin (diabetes). (R. 362). Dr. Riley also proscribed an Acrochamber, a precision monitor and monitor strips. (R. 362).

Dr. Riley also completed a residual functional capacity questionnaire at that time. (R. 358-61). She reported a diagnosis of hypertension, type 2 diabetes, moderately persistent asthma, and osteoarthritis; she called plaintiff's prognosis "fair." (R. 358). She said that plaintiff's symptoms were nerve pain and numbness in her fingertips, pain in her hips that travels down her legs, and blurred vision. (R. 358). These symptoms, according to Dr. Riley, constantly interfered with

16

plaintiff's attention and concentration. (R. 359). She needed reading glasses, and also needed to avoid asthma triggers of "dust, dry temperature extremes strong odors." (R. 361). Dr. Riley reported that the hip pain was related to the degeneration of plaintiff's hip joint and the finger pain and discomfort was the result of nerve damage. (R. 358). She also reported that, due to the medications she took, plaintiff experienced side effects of nausea and diarrhea. (R. 358). According to the doctor, plaintiff was not a malingerer. (R. 359).

Dr. Riley also felt that depression affected plaintiff's physical condition. (R. 359). She did not elaborate on this non-specific conclusion, and more importantly, she did not prescribe any anti-depressant medication or refer Ms. Rogers for any kind of counseling or other therapy. Finally, she did not conclude that Ms. Rogers' "depression" prevented her from working.

Dr. Riley opined that plaintiff was capable of tolerating only "low stress" in a job situation. (R. 359). Dr. Riley also reported that plaintiff could stand for no more than 45 minutes at a time and stand/walk a total of less than two hours during an eight-hour workday. (R. 3 59-60). Plaintiff could sit for an hour at a time for a total of about four hours during an eight-hour work day and would have to be able to shift at will between sitting, standing and walking. (R. 360). Along these lines, Dr. Riley felt that plaintiff would need to be able to walk around for 15 minutes every half an hour and that she would likely need three unscheduled 10-minute breaks throughout the work-day. (R. 360). During prolonged sitting, plaintiff would need to elevate her legs 6-8 inches. (R. 360). Despite plaintiff's degenerative hip impairment, Dr. Riley reported that plaintiff could bend and twist for 75% of an eight-hour workday. (R. 361). Dr. Riley opined that plaintiff could lift and carry up to 20 pounds, but that she could use her hands for grasping, fine manipulation, and reaching for only

17

about a third of a workday. (R. 360-61). Dr. Riley also estimated that plaintiff would likely be absent from the workplace once a month. (R. 361).

## B.
## The Plaintiff's Testimony At The Hearing

Ms. Rogers testified that her diabetes caused her to feel dizzy about three or four times a week, when she would have to lie down for an hour and a half. (R. 64). She said she experienced a tingling or a numbness in the fingertips of her left hand, and a pain in her right thumb. (R. 64). She is right-handed. (R. 92). Plaintiff said she had "a little bit" of problem using her right hand, explaining she had trouble combing her hair and washing dishes. (R. 64). Her hands were stiff in the morning when she woke up. (R. 74). She was able to make a fist and carry some things, but could not peel potatoes or cut things up. (R. 91-92). All this was consistent with her prior complaints to doctors and with the empirical medical evidence.

She said that both her hips hurt when she lay down, but also that they mostly hurt when she walked too much. (R. 65). She could walk about a block before her hips began to hurt. (R. 65). But she went on to say that she typically walked around the block every day (R. 70), and she was somewhat equivocal as to whether her ability to walk was limited by pain in her hip or simply because she just tired easily. (R. 66). [15] She did state that her hips also hurt when she climbed stairs or stood in one place. (R. 75). According to plaintiff, her bleeding ulcer affected her when she got up in the morning to go to the bathroom. (R. 68). Her ulcers have improved, however, since she stopped drinking. (R. 93). She testified that she got headaches three or four times a week, each lasting about an hour. (R. 68).

---

[15] Ms. Rogers, after all, was only 5'1" but weighed almost 180 lbs. and continued to be an habitual smoker despite pulmonary problems.

18

Although the plaintiff was frightened when she suffered asthma attacks (R. 61), she still smoked a pack of cigarettes every few days. (R. 61). Her asthma was worse when the weather was too hot or too cold or when it was humid. It was also affected by strong odors. (R. 74-75). Plaintiff stated that she took Tylenol for her headaches (R. 68), and extra strength Tylenol for her pain. (R. 91). She explained that she did not always take her other medication because she had to make it "stretch" until she could get to the Provident Hospital clinic for refills. (R. 67).

She sought to account for her noncompliance with her medical regimen by claiming that she lacked bus fare and could not get to the hospital to refill her prescriptions. (R. 67; 77-78). She also reported that she was finally getting glasses to correct her vision. (R. 92).

At the time of the hearing, plaintiff was living with her sister. (R. 70). Prior to that, plaintiff lived with her mother until her mother died. (R. 79). Plaintiff also related that she would stay with her son when she and her sister argued. (R. 79). There were times, plaintiff explained, that she was homeless when no one in her family would let her stay with them. (R. 80). She had difficulty getting along with her family. (R. 95). She has five adult children – four sons and a daughter – ranging in age from 23 to 36. (R. 80). Plaintiff testified that she lived for a time at a shelter and at the Haymarket Center while being treated. (R. 95-96). This was contrary to statements made in May 2001 to the staff at the Haymarket Center, to whom she reported perfectly amicable relations with her entire family.

She claimed that she was only at the Haymarket Center because of alcohol abuse and that her involvement at the Haymarket had absolutely nothing to do with drugs. (R. 96). This testimony would be belied by records from the Haymarket, which were obtained after Ms. Rogers' testimony. Ms. Rogers claimed that since she left the Haymarket, she has not been drinking, so she does not

19

bother going to meetings. (R. 97). This sudden cessation of drinking represented a dramatic recovery from 35 years of chronic alcoholism.

While discussing her living situation with the ALJ, plaintiff became tearful and rocked back and forth in her chair. (R. 25, 98). Plaintiff later testified that she has crying spells such as these two or three times a day. (R. 98-99). She said that she spoke about this sadness with Dr. Riley and that this helped. She conceded that Dr. Riley had never referred her for counseling or prescribed antidepressant medication of any kind. (R. 98-99).

Plaintiff said she would typically spend the morning watching television, and would also usually walk around the block and play cards. (R. 70). She drinks a lot of water, and estimated that she went to the bathroom about twenty to thirty times a day. (R. 71). Plaintiff testified that she has worked in a laundry, and at a seatbelt factory, but that those jobs were long ago. (R. 58, 81-82). After those jobs, she explained:

> I met a – this guy and he – I had three children by him. He wouldn't let me work so
> that was that.

(R. 82). Then, in 1995, she worked as a live-in housekeeper for a friend. (R. 83). That arrangement lasted five years until the man died. (R. 83). Most recently, she babysat at the home of a family with six children, but had to quit when the family decided she should have child-care training to do the job. (R. 85-86). She again claimed that she was unable to afford bus fare to get to the job. (R. 86). According to plaintiff, she then worked as a hotel maid for two or three months in 2000. (R. 60, 87). After that, she felt she could no longer work because her "legs were hurting. [She] found out [she] had bleeding ulcers and [her] hands – . . ." (R. 87).

20

## C.
## The Vocational Expert's Testimony

The vocational expert ("VE") testified that plaintiff's past relevant work in the laundry was unskilled and medium in exertional level, while her housekeeping job was unskilled and light. (R. 102). He considered plaintiff's brief stints as a bartender and a babysitter to be unsuccessful work attempts. (R. 102). The ALJ asked the VE to consider a hypothetical, right-handed individual with a vocational background similar to plaintiff's who could perform a full range of light work but: could not climb ladders or scaffolds; could only occasionally climb stairs or ramps; could only occasionally bend, stoop, kneel, or crawl; could not tolerate extremes of temperature or humidity or respiratory irritants; could not work around unprotected heights or hazardous equipment; and who suffered occasional decreased feeling in the left hand. (R. 103).

When asked whether such an individual could perform any of plaintiff's past relevant work, the VE replied in the negative. (R. 104). The VE went on to state, however, that such an individual could perform 10,000 cashier jobs, 8,000 assembly jobs, and 7,000 hand packaging jobs. (R. 104). As such, the numbers he cited reflected a 50% reduction in the overall number of jobs at these positions. (R. 105). The VE explained that the restrictions set forth by the ALJ "would be more of a sit/stand type of variety," and that the jobs he cited involved "sitting a fair amount of time." (R. 104). If such a person had the further limitations of being unable to stand and walk more than two hours a day, unable to use her hands for manipulation for more than 30% of the day, requiring three ten minute breaks each day, needing to elevate her legs while seated and needing to miss one day of work each month, the VE said the individual could not perform any jobs. (R. 107). The VE also testified that if an individual experienced pain that frequently interfered with attention and concentration, she could perform none of the jobs he had cited. (R. 105-06). He added that there

21

was not a significant discrepancy between the jobs he cited and the descriptions in the *Dictionary of Occupational Titles*. (R. 105). On cross-examination, the VE noted that problems would arise if a cashier needed to take breaks during busy periods (R. 108). In addition, the assembly and packaging jobs require the worker to maintain a competitive pace, "usually what's called an industrial minimum." (R.108).

## IV.
## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity since 1999, when she alleges she became disabled. (R. 24, 40). Next, she determined that plaintiff had several severe impairments: asthma and/or COPD; non-insulin dependent diabetes; hypertension; arthritis; peptic ulcer disease; obesity; and a history of substance abuse, reported to be in remission. (R. 25, 40). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. § 416.920(c). The ALJ concluded that while the record suggested that plaintiff was depressed, she did not suffer from a medically determinable severe mental impairment – other than substance dependence (R. 25, 40), which is excluded by the Act. She further determined, however, that none of the plaintiff's impairments, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 25-27, 40). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"). She reviewed in detail the medical evidence, beginning with the plaintiff's emergency room visit in July of 1999. She provided a summary of each instance of plaintiff's medical treatment, including emergency room visits, hospital and rehabilitation clinic stays, and her various consultative examinations. (R. 27-33).

22

She noted plaintiff's clinical and laboratory test results, including the July1999 and January 2000 chest x-rays demonstrating calcified lymph nodes since at least March of 1998, studies showing both normal and reduced strength and range of motion in plaintiff's hands, an upper GI examine consistent with mild gastritis, a normal x-ray of plaintiff's right hip, a near normal x-ray of plaintiff's right hand, a pulmonary function study showing reduced lung capacity, elevated glucose level readings, and alternately elevated and stable blood pressure readings.

This elaborate review led the ALJ to conclude that overall the record demonstrated that Ms. Rogers:

> has received some routine primary care for her chronic impairments, but that she has had significant periods during which she was treated most often in emergency rooms, and did not have regular or routine visits with a doctor or clinic. The overall record shows that [plaintiff] has admitted often that she has run out of prescribed medications, that she has difficulty following the prescribed diet, and that she has adjusted doses of the prescribed medications to make prescriptions last longer. [Plaintiff] has continued to smoke cigarettes, in spite of her asthma and COPD, and continued to smoke cocaine regularly, further exacerbating her respiratory problem until May, 2001. (R. 27).

The ALJ also considered the medical opinions in the record. She related Dr. Riley's assessment that plaintiff was rather severely limited by her impairments and Dr. Belich's far more benign evaluation. She also reviewed Dr. Bone's evaluation of the medical evidence as of March of 2000. The ALJ felt that Dr. Riley's opinion was not necessarily supported by objective medical findings or the doctor's own progress notes. The ALJ said that those notes neither reflected complaints of significant problems with ambulation or the use of either hand prior to March, 2002 nor mentioned examinations finding significant abnormalities affecting plaintiff's extremities. The ALJ chose to give some, but not controlling, weight to Dr. Riley's opinion. (R. 34-35).

23

On the other hand, she gave greater weight to Dr. Belich's opinion. The ALJ explained that Dr. Belich reported objective medical findings which were normal or near normal, and therefore consistent with his opinion of plaintiff's essentially unlimited residual functional capacity for at least certain kinds of work. (R. 35). She gave little weight to the opinion of Dr. Bone, who neither treated nor examined plaintiff. (R. 35).

The ALJ assessed plaintiff's symptoms and complaints and considered the factors in 20 C.F.R. § 416.929(c) and Social Security Ruling 96-7p. (R. 35). According to the ALJ, plaintiff's testimony about the nature and degree of her physical limitations was not fully consistent with, nor well-supported by, the other evidence of record. (R. 36). The ALJ said that the record did not establish that plaintiff complained frequently to Dr. Riley or other treating doctors that she had trouble using her hands or had problems walking due to pain. (R. 36). She also thought the record did not support a finding that plaintiff had an impairment that required her to keep her legs elevated. (R. 36). She also noted that plaintiff "has not needed prescription strength pain medication during the relevant period." (R. 37). *Cf. Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005)(among the factors court of appeals discussed was that plaintiff was not taking prescription medication).

The ALJ quite properly expressed concern about Ms. Rogers' testimony and her lawyer's representation that plaintiff had not used cocaine for the last 15 years and that her stay at the Haymarket had nothing to do with drugs. Those claims, the ALJ correctly emphasized, were dramatically at odds with the records of the Provident Hospital and the Haymarket Center. (R. 37). The ALJ noted that there was no evidence that plaintiff had abused drugs or alcohol since she left the Center in 2001. (R. 37).

24

After considering the totality of the evidence, the ALJ found that plaintiff retained the capacity to perform "most light work" (R. 37, 41), which the regulations define as involving:

> occasionally lifting no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds, or it may involve infrequent lifting but require substantial walking or standing or sitting with the pushing or pulling of arm or leg controls.

20 C.F.R. § 416.967(b). The ALJ found that plaintiff was further restricted insofar as she could not climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. In addition, she determined that plaintiff should not be exposed to extremes of temperature, humidity, respiratory irritants, unprotected heights, or unguarded hazardous equipment. The ALJ added that plaintiff had a slight reduction in sensation of her non-dominant left hand, but otherwise had normal ability to use her hands for fine and gross manipulation, and did not need to elevate her feet while seated. Finally, the ALJ found that plaintiff's mental ability to perform unskilled work was not significantly limited, and that she could sustain the demands of such work despite her pain and feelings of depression, which would seldom interfere with her concentration, persistence or pace for work of that kind. (R. 37-38).

The ALJ then reviewed plaintiff's limited work history. (R. 38). She noted that plaintiff's housekeeping work had been light and unskilled, and that the other jobs she held were so short in duration that they were not vocationally relevant. (R. 38). The ALJ adopted the VE's opinion that the plaintiff could not perform her past work as a housekeeper because of the frequent stooping required. (R. 39, 41). Next, she considered whether plaintiff could perform other jobs that existed in significant numbers in the economy. Considering the fact that the plaintiff was approaching advanced age, had a seventh grade education and was able to read and write, had no transferable skills from past work, and had the capacity to perform a significant range of light work, the ALJ

25

employed the Medical-Vocational guidelines as a framework to find that plaintiff was not disabled. (R. 39, 41). Finally, the ALJ relied upon the VE's testimony that a hypothetical person with the plaintiff's limitations could perform jobs such as cashier – (10,000 such jobs in the Chicago region) – light assembly – (8,000 such jobs) – and hand packer – (7,000 such jobs) – despite her postural, environmental, and other limitations. (R. 40). As a result, the ALJ found that plaintiff was not disabled and was not entitled to SSI under the Act. (R. 17, 18).

# V.
# ANALYSIS

## A.
## The Standard Of Review

The applicable standard of review of the Commissioner's decision is a familiar one: a court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is more than a scintilla and something less than a preponderance. *See Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir. 1992); *Young v. Secretary of Health & Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Binion*, 108 F.3d at 782.

While judicial review is deferential, *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995), the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for his decision at some minimal level. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.
## The Required Five-Step Sequential Analysis

Social Security Regulations require a five-step sequential inquiry by the ALJ to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any

point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## The Record Demonstrates That The ALJ Did Not Use Plaintiff's Poverty Against Her

The first of the several issues plaintiff contends requires a remand is that the ALJ improperly used her poverty against her and manifested a "sociologic inability to appreciate the circumstance of an individual without the financial means to even afford bus fare." (*Pl.Mem.* at 17).[16] As Learned Hand said in another context, the only thing about the argument we can commend is the hardihood in supposing it could possibly succeed. *United States v. Minneci*, 142 F.2d 428, 429 (2nd Cir. 1944).

At the outset of the hearing, the ALJ explained to Ms. Rogers that under current law, if a claimant cannot work because of a substance problem, he or she was not entitled to benefits. (R. 52). In her opening statement, Ms. Rogers' lawyer stressed that "there's been no illegal substance abuse in at least the last 15 years, perhaps even longer than that," and that the case did not involve drugs and alcohol. (R. 54). Consistent with that theme, Ms. Rogers emphatically denied that her 19-day stay at the Haymarket Center in May 1991 stemmed from any drug usage. (R. 96). She also testified with equal solemnity that she often was forced to allow her prescriptions to remain unfilled because

---

[16] The "unfounded sociological speculations" phrase was used by Judge Posner in *Sarchet*, 78 F.3d at 308 to describe an ALJ's conclusion that the claimant's credibility was undermined by her extremely poor work history. The ALJ, as Judge Posner demonstrated, "ignored" the overwhelming evidence of the significant and undeniable medical ailments from which Ms. Sarchet had long suffered and which made her "unemployable." Ms. Rogers' reliance on a phrase surgically excised from its informative context illustrates the danger of taking judicial language out of context, *United States v. Gerke Excavating*, Inc., 412 F.3d 804, 808 (7th Cir. 2005). *See also Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)("Judges expect their pronunciamentos to be read in context." ).

28

she could not afford bus fare to go to the hospital to refill them, even though they were vital to the treatment of her medical ailments.

"[O]f course, the Administrative law judge did not have to believe" Ms. Rogers. *Sarchet*, 78 F.3d at 307. *Accord Johnson v. Barnhart*, 449 F.3d 804, 805 (7ᵗʰ Cir. 2006). She was entitled – indeed she was obligated – to determine the validity of Ms. Rogers' testimony since under the Act, benefits may not be awarded for disabilities causally linked to drug usage.[17] But, making judgments about who is telling the truth is a tricky business. The reviewing court lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7ᵗʰ Cir. 2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("a few minutes observation of the parties in the courtroom is more informing than reams of cold record."). That is why appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is entitled to "special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7ᵗʰ Cir. 2000).

Judges often overestimate their ability to sift true from false testimony by assessing demeanor, "which is a form of lie detector without the electrodes and graph paper." *Djedovic v. Gonzales*, 441 F.3d 547, 551 (7ᵗʰ Cir. 2006). Judge Posner has cautioned that it is extremely difficult to determine whether a witness is testifying truthfully, and, much pious lore to the contrary

---

[17] Congress amended the Social Security Act in 1996 to prohibit the payment of social security disability benefits based on an applicant's alcoholism or drug addiction. *See* Contract with America Advancement Act of 1996, Pub.L. 104-121, 110 Stat. 847. The Act now provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subchapter) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). *See O'Kane v. Apfel*, 224 F.3d 686, 687-88 (7ᵗʰ Cir. 2000). This was all explained to Ms. Rogers by the ALJ. (R. 52).

notwithstanding, demeanor is often an unreliable guide to truthfulness. *See Consolidation Services v. Keybank National Association*, 185 F.3d 817, 820 (7th Cir. 1999); *United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998); *Carradine*, 360 F.3d at 751.

Nonetheless, demeanor continues to be thought a significant component of credibility determinations. *See Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005), *cert. denied sub nom*, 126 S.Ct. 2862 (2006). *Cf. United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir. 1982) *(en banc)*(ability of judge to observe demeanor of jurors). Indeed, the Supreme Court has said that the demeanor of a witness may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story, "for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001)("completely proper in making credibility determinations" in social security case for ALJ to rely on claimant's demeanor).

Perhaps the ALJ in this case was sensitive to the inherent difficulty in making credibility judgments based solely on demeanor. Or perhaps she just was not sure enough about Ms. Rogers' affect and demeanor to feel comfortable about either accepting or rejecting certain portions of her testimony. Whatever the reason, the ALJ chose to follow the most responsible of courses and to request that medical records from Provident Hospital and the Haymarket Center be produced. This is the kind of careful attention to matters of credibility that is encouraged by social security regulations and reviewing courts alike.

SSR 96-7p counsels ALJs to look to extrinsic documents in making credibility determinations.[18] The Seventh Circuit has stressed that credibility involves more than demeanor, *Indiana Metal Products v. NLRB*, 442 F.2d 46 (7th Cir. 1971 ), and that documents or objective evidence may contradict the witness' story, or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. *See Pinpoint Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D. Ill. 2004) (Posner, J.) (sitting by designation). Indeed, where such factors are present, a court of appeals can find clear error in a finding of credibility based on demeanor, even though such determinations are, as a matter of practice, usually insulated from appellate review. *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260, 263 (7th Cir. 1986).

Thus, at the close of the hearing in this case, the ALJ noted that since there had been "significant testimony" about the Provident and Haymarket Center hospitalizations, she thought it appropriate to examine the records from these facilities "to corroborate [Ms. Rogers] testimony." (R. 110). Ms. Rogers' attorney did not object to this request, and promised she would provide the records. The ALJ thus held the administrative record open for 30 days. (R. 110).[19] The Provident Hospital records were produced, and the ALJ obtained the Haymarket records.[20]

---

[18] The regulation instructs ALJs to "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e)."

[19] Although this was the third application for supplemental security income, the requested medical records had not been used to support Ms. Rogers' applications. Little wonder: they revealed that Ms. Rogers had a serious drug dependency problem and would have revealed her perjury at the hearing.

[20] Ms. Rogers concedes that the ALJ could have made a credibility determination based on demeanor alone. (Reply Memorandum at 5). Oddly, she faults the ALJ for not having done so and for having relied (continued...)

31

The Haymarket records were as detailed as they were revealing. They reflect Ms. Rogers' 15-year history of crack cocaine usage (coupled with her 35 years of alcohol abuse). The diagnosis of cocaine addiction made by the Haymarket staff were based on the very precise statements made by Ms. Rogers in "an in-person interview" with her. (R. 411; 409-413). For example, Ms. Rogers said that she noticed in 2000 that she was spending a lot of time using drugs; that she had tried on March 8, 2001 to stop but was unable to do so; that in 1999 she noticed certain effects of the drugs; and that she had experienced blackouts for 15 years as a consequence of her drug use. (R. 403-417). She gave very precise cost figures for her cocaine purchases which ranged from $40 per day when she was 36 years old to $100 per day when she was 40 years old and then back to $40 per day for her "several times per week" crack cocaine usage in the preceding 12 months. She explained that she smoked the cocaine. (R. 404-405). She explained the reasons for her 2 months of sobriety in 2001 and discussed the reason for her relapse. She denied using any other drugs besides cocaine. (R. 406-407). The Haymarket staff was certain that Ms. Rogers was truthful in her reporting about her drug problem and its history and that she had a profound drug problem. (R. 411).

The Provident and Haymarket records proved two things: first, during the time the plaintiff swore under oath she had trouble finding $3 or 4 dollars per/month for bus fare, she had enough money to fund what was at least her several hundred dollar per month drug addiction. (R. 31, 410-

---

[20](...continued)

on documentary evidence that in this case was far more reliable and revealing.

413)[21]. Second, that Ms. Rogers' claim that she was drug-free for 15 years and that her stay at the Haymarket did not involve drug abuse was knowingly false.

In her decision, the ALJ emphasized that although they had the opportunity to comment and give closing argument as it related to these records (R. 23), "neither claimant nor Ms. Goldbloom [plaintiff's lawyer at the hearing and in these proceedings] offered any explanation, post-hearing, for [the] *glaring discrepancy* between claimant's testimony and the treatment records. These material inconsistencies in claimant's testimony about her substance history cases significant doubt on claimant's credibility." (R.37)(Emphasis supplied). The ALJ concluded that Ms. Rogers' allegations regarding her physical limitations were not totally credible since they were inconsistent with record evidence and her lies about drug dependency. (R. 41).

In addition to offering no explanation during the extended period that the hearing remained open for the glaring and disturbing inconsistencies between her client's sworn testimony and the production of the Haymarket records, the plaintiff's opening brief ignored these inconsistencies and the ALJ's credibility determination based on those records. Saving the least for last, the reply brief for the first time contended that the ALJ's conclusion that Ms. Rogers was not a credible witness is faulty because the ALJ "utterly failed to consider the context of plaintiff's association with the

---

[21] For at least a portion of the period in question, it is possible that the plaintiff may have spent up to $35,000 per year on her habit. (R. 405).

If plaintiff were *earning* what she spent on cocaine, even at the low ebb of her habit in 2000-2001, she would be presumed to be engaging in substantial gainful activity and found not disabled at step one of the five-step analysis. 20 C.F.R. § 416.974(b)(2)(earnings of more than $700 per month will ordinarily show that the plaintiff engaged in substantial gainful activity). The issue of the source of the funds used by Ms. Rogers for her drug habit was not considered by the ALJ. *Compare Jones v. Shalala*, 21 F.3d 191, 193 (7th Cir. 1994)(plaintiff who stole to support $60 a day substance abuse habit not entitled to SSI); *Dotson v. Shalala*, 1 F.3d 571, 573 (7th Cir. 1993)(plaintiff who financed a $200 to $300 a day cocaine habit through stealing and begging was not entitled to SSI).

Haymarket facility." (*Reply Memorandum* at 6). "Objections to [this] startling thesis crowd the mind." Posner, Overcoming Law, 211 (1995).

First, the ALJ's credibility determination cannot be overturned because the plaintiff's lawyer has hypothesized a implausible version of events that posits that Ms. Rogers lied to the Haymarket staff but not to the ALJ.[22] The question is not whether Ms. Rogers gulled the Haymarket staff, but whether the ALJ's credibility determination is "patently wrong" and whether there is substantial evidence to support the determination that Ms. Rogers lied at the hearing. *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). It is frivolous to suggest that the ALJ's credibility determination in this case is patently wrong, that it is not supported by substantial evidence, or that the ALJ did not build an accurate and logical bridge between the evidence and her ultimate conclusion. *Carradine*, 360 F.3d at 753; *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000); *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987).

Second, the belatedly advanced argument that Ms. Rogers lied to the Haymarket staff was never presented to the ALJ and thus is it waived. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004); *Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999). *See also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35-36 (1952).

Third, the "I lied to the Haymarket staff but not to the ALJ" theory was first advanced in Ms. Goldbloom's reply brief, although it could easily have been raised in the opening brief – which in

---

[22] The tendentious post-hoc rationalization offered in the reply brief, had it been made to the ALJ, would still have allowed her to have found Ms. Rogers' credibility highly suspect. Those who are willing to lie to gain some benefit "may well be trying to pull the wool over the agency's eyes" to gain some further advantage. *Alsagladi v. Gonzales*, 450 F.3d 700, 701 (7th Cir. 2006). *See also* Rule 608(b), Federal Rules of Evidence.

34

fact alluded to the Haymarket records. (*Plaintiff's Memorandum*, at 6, n. 7-8). Hence it is waived on that basis also. *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004).

Fourth, even if I were authorized to weigh the competing merits of the alternative lie theory, the ALJ's credibility determination is beyond reasonable debate. There is simply no evidence to support the conclusion that Ms. Rogers lied to the Haymarket staff. Unsupported statements in lawyers' briefs do not count.[23] Quite apart from being admissions of a party, the statements made by Ms. Rogers were presumptively truthful. Indeed, the long-standing exception to the hearsay rule to statements made for purposes of medical diagnosis or treatment and describing medical history or past or present symptoms, pain or sensation or the inception or general character of the cause or external source thereof is premised on their inherent reliability. *See* Rule 803(4), Federal Rules of Evidence.

To that should be added the fact that the intake personnel at the Haymarket Center concluded that Ms. Rogers "did not deliberately misrepresent the information about her drug and alcohol use and history" – a history that revealed that Ms. Rogers "has a profound drug problem. . . ." (R. 411). Implicit in the determination that Ms. Rogers had lied at the hearing was a determination that she had told the truth to the staff at the Haymarket Center.

Fifth, the argument that Ms. Rogers really only lied to the Haymarket staff because she needed to in order to gain access to the facility, carefully puts out of view both the nature of the Center – which is designed to aid the homeless (*see infra* at 46) – and the fact that the fact that a few

---

[23] *Cf.*, *IFC Credit Corp v. Aliano Brothers General Contractors, Inc.*,437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 494 (7th Cir. 2003); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984).

days earlier Ms. Rogers had also told the doctors at Provident Hospital of her cocaine problem. (R. 327).[24]

Reviewing courts will not overturn an ALJ's credibility determination unless it is "patently wrong." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). It is idle to suggest that the ALJ's credibility determination in this case is patently wrong, that it is not supported by substantial evidence, or that the ALJ did not build an accurate and logical bridge between the evidence and her ultimate conclusion. *See Skarbek*, 390 F.3d at 504-505; *Carradine*, 360 F.3d at 753; *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000); *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987).

In sum, it is fatuous to suggest that the ALJ's negative credibility determinations are not supported by substantial evidence.

## D.
## The ALJ Properly Evaluated The Treating Physician's Opinion

Equally unpersuasive is the argument that the ALJ did not provide a proper rationale for discounting the opinion of Ms. Rogers' treating physician. Dr. Riley concluded that plaintiff's pain and numbness would constantly interfere with her concentration and attention, that she could stand or walk for just 45 minutes at a time and no more than two hours in an entire day, that she could sit for only a half-hour at a time before she would have to walk around for 15 minutes, that she had to elevate her legs when sitting, that she could lift and carry twenty pounds but only use her hands for grasping, fine manipulation, and reaching for about one-third of a workday.

---

[24] If in fact there had been no difficulties with drugs for the past 15 years as Ms. Rogers' lawyer told the ALJ, it was reasonable to assume that that chronology would have been noted as was her claimed recent cessation of drinking. (R. 337). At least, the ALJ could have so inferred.

36

Of course, Ms. Rogers is not entitled to benefits merely because her treating physician said that she is disabled or unable to work. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). An administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence – which need not itself be medical in nature. *Wilder*, 64 F.3d at 337. *See also Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004)(opinions of treating physicians are not controlling if they are inconsistent with the record as a whole); *Reed v. Barnhart*, 399 F.3d 917, 920-21 (8th Cir. 2005).

Indeed, the Seventh Circuit has recently held that decisive medical opinion contrary to that of a treating physician can even come from physicians "who had not treated or even examined" the claimant. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)(Posner, J.). *Hofslien* made clear that once contrary, competent medical evidence contradicting that of the treating physician is introduced the ALJ no longer gives primacy to the treating physician's opinions and the treating physician's evidence "is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377.

The ALJ found that Dr. Riley's opinion was entitled to "some, but not controlling weight." (R. 35). She chose to give significant weight to the opinion of Dr. Belich, a consultative physician who examined Ms. Rogers. (R. 35). Under pre-*Hofslien* cases, an ALJ must accord a treating physician's opinion regarding the nature and severity of a medical condition controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence in the record, such as the findings of other examining physicians. 20 C.F.R. § 404.1527(d)(2); *Dixon*, 270 F.3d at 1177; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir.2005). But as *Hofslien* made clear, this

37

is not much of a guide, for if the evidence is well-supported and there is no contradictory evidence, there is no basis on which an ALJ could refuse to accept it. 439 F.3d at 376.

Should an ALJ determine that a treating physician's opinion is not entitled to controlling weight, 20 C.F.R. § 416.927(d)(2)-(6) requires that the ALJ consider the following factors in determining the weight to accord the opinion: length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability; consistency with the record as a whole; and specialization. "The checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much weight to give it, there seems no room for him to attach a presumptive weight to it." *Hofslien*, 439 F.3d at 377. Thus, the weight properly to be given to testimony or other evidence of a treating physician cannot be determined by any formula in advance; it "depends on circumstances." *Id*.

In the instance case, the ALJ carefully explained her reasons for discounting Dr. Riley's opinion. First, it was in many respects unsupported by other objective medical evidence and by Dr. Riley's own progress notes, which did not reflect complaints that the plaintiff had limitations walking and using her hands before March of 2002, the date of the hearing. Where an opinion is inconsistent with progress notes it may be discounted. *Skarbek*, 300 F.3d at 503. *See also Jones v. Commissioner of Social Security*, 336 F.3d 469, 476-77 (6th Cir. 2003)(failure to discuss crying spells and panic attacks with doctor is a basis for discounting the testimony); *Richmond v. Shalala*, 23 F.3d 1441, 1443 (8th Cir. 1994)(claimed side-effects of medication never discussed with physician nor

change of medication requested); *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995)(activities reported on disability report were less limited than testimony before ALJ).[25]

Although Ms. Rogers complained about pain and limitations in the use of her hands and walking as far back as the autumn of 1999, the complaints were in large measure insignificant. In September of 1999, for example, the plaintiff went to the Sengstacke Clinic complaining that the strength in her hand "was gone." Later in that visit, she explained what she meant, namely that she had "stiffness of hands, but no further complaints." (R. 243). Dr. Bernardo, a consultative physician, related that plaintiff complained of pain in her right hip in October of 1999, and that there was tenderness and reduced range of motion. Plaintiff's gait was only "mildly antalgic," however, and Dr. Bernardo noted that she had only "some difficulty" performing certain activities: walking fifty feet, walking on her toes, walking on her heels, tandem walking, squatting, and rising. (R. 254). At the same time, Dr. Bernardo found plaintiff had no problems at all using her hands – her strength and dexterity were normal. (R. 254). In February of 2000, Plaintiff reported joint stiffness lasting 30 to 60 minutes at a time (R. 309), and she sought treatment for pain and swelling in her right thumb in March of 2000, at which time a reduction in range of motion was noted. (R. 294).

Significantly, x-rays of plaintiff's two "problem areas" – her hand and hip – were negative. On October 20, 1999, an x-ray of her right hip was normal. (R. 264). The December 11, 2001 x-ray of plaintiff's right hand revealed nothing more than mild degenerative osteoarthritic changes in the

---

[25] Impeachment by omission is a valuable tool in making credibility determinations. *See Moylan v. The Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992). The possible availability of the plaintiff's medical records to Dr. Riley does not require rejection of the ALJ's determination that the absence of complaints in the progress notes justifies the inference that no complaints were made because the conditions on which Ms. Rogers relied for her disability did not exist – or at least were not debilitating. For example, if Dr. Riley had seen plaintiff's complaints to other doctors, it is a reasonable inference, given the care and solicitude she showed Ms. Rogers, that she would have made some inquiry and that the progress notes would have reflected the inquiry and Ms. Roger's response.

thumb, while the rest of the hand was normal. (R. 351). On March 2000, plaintiff was examined at the Sengstacke Clinic by Dr. Nelson, who reported that plaintiff's grip strength and gross and fine manipulation were 5/5 in the left hand, but only 1/5 in the right hand. (R. 269). In addition, he reported that plaintiff had "poor pincer grasp and fine manipulation," in her right hand. (R. 270). Dr. Nelson stated that plaintiff was unable "to use hands for fine movement, pincer grasp and manipulation of objects. Hence, this impairs her activities in daily living." (R. 272). He did not indicate, however, that plaintiff's ability to walk or to do work related activities such as sitting, standing, moving about, lifting, carrying, handling objects or traveling. (R. 270). And while, for the most part, plaintiff's arthritis is not termed a significant problem inducing anything more than stiffness (R. 288, 290, 295), on one occasion, in September of 2000, her arthritis is said to be "oftentimes quite disabling." (R. 301).[26]

The ALJ's conclusion that although the plaintiff suffered from a number of significant maladies, she was not *disabled* within the meaning of the Act is supported by substantial evidence. Even the plaintiff's own testimony confirms what the record as a whole showed, namely that her osteoarthritic condition was not disabling. She acknowledged that Extra Strength Tylenol was helpful in treating her condition, and that was the medicament that was found sufficient to treat her condition. (R. 91). She conceded that she was able to make a fist with her left hand and that she could carry things. As to her right hand, she conceded that she could use her right hand for most normal functions, except for "peeling potatoes or stuff like that" because it hurt her right thumb. (R. 92).

---

[26] Of course this conclusion was based upon statements by the plaintiff, whose credibility the ALJ properly found open to the most serious question. (R. 31, 41).

40

To the extent that there are conflicts in the medical evidence, it is the ALJ's province to resolve them. *Dixon*, 270 F.3d at 1178. The objective medical evidence includes a normal right hip x-ray, and a near-normal right-hand x-ray. The greater weight of the other medical findings – clinical notes, consultative exams, etc. – speaks of only mild limitations. These are the records plaintiff contends Dr. Riley considered, and these are the records the ALJ used in assessing Dr. Riley's opinion that the plaintiff was *disabled*. Rather than undermining the ALJ's rejection of Dr. Riley's rather dire view of plaintiff's condition, the record as a whole supports the ALJ's conclusion. Complaints of extreme pain were inconsistent with the findings of all the doctors who examined her and opined that she had only minimal or moderate limitations. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005)(allegations of disabling pain inconsistent with reports of doctors who found only moderate limitations).

Whether to credit Ms. Rogers' complaints of extreme pain were a function of her credibility. *Sims v. Barnhart*, 442 F.3d 537, 538 (7th Cir. 2006)(Posner, J.). In light of Ms Rogers' mendacity, the ALJ was justified in discounting the severity of her complaints. Credibility determinations like this can rarely be disturbed by a reviewing court. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported. . . can the finding be reversed." *Id*. at 538. Ms. Rogers' complaints of extreme pain were entitled to be discounted by the ALJ in light of her amply supported conclusion that Ms. Rogers had lied rather badly at the hearing.

As the ALJ recognized, Dr. Riley's statements about plaintiff's complaints were largely an uncritical listing of them, rather than an independent and objective assessment of her capacity to-do some work. (R. 34). In fact, her RFC evaluation gives the impression of simply recording

41

plaintiff's complaints, which are a function of Ms. Rogers' credibility and call into question the objective basis for Dr. Riley's conclusions. *See White*, 415 F.3d at 659.

The ALJ was also entitled to weigh in the balance the indisputable fact that "[a]pplicants for disability benefits have an incentive to exaggerate their symptoms" and a treating physician may be biased to help a patient. Indeed, treating physicians "will often bend over backwards to assist a patient in obtaining benefits." *Hofslien*, 439 F.3d at 376-77. *See also Dixon*, 270 F.3d at 1177.

In sum, substantial evidence supports the ALJ's decision not to accord Dr. Riley's findings controlling weight.

## E.
## The ALJ Adequately Considered Plaintiff's Diabetes And Asthma In Her RFC Finding

We come then to the argument that the ALJ committed legal error in arriving at her RFC finding. First, the plaintiff expresses concern over the fact that the ALJ appears to have picked and chosen among the opinions of Drs. Riley, Belich, and Bone to make an RFC finding. (*Plaintiff's Memorandum*, at 19). That is, the ALJ's finding does not exactly match any of the opinions of these physicians. But, as the Commissioner points out, the ALJ need not accept only physicians' opinions in finding an RFC; if conflicting medical evidence is present, the ALJ has the responsibility of resolving the conflict. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). That is not, as the plaintiff protests, "playing doctor;" it is being a judge.

The argument that the ALJ ignored plaintiff's diabetes and asthma is belied by the record. (*Plaintiff's Memorandum*, at 19). She clearly considered both impairments, finding them to be severe, but not disabling. (R. 25, 26-32, 40). A diagnosis of diabetes and asthma does not lead inexorably to a finding of disability. Literally millions suffer from these diseases without being incapable of gainful employment in virtually every field of human endeavor. The ALJ's conclusion

42

that Ms. Rogers is not disabled and that she is capable of performing a limited range of light work is supported by substantial evidence.

The Act defines "disability" as the "inability to engage in any substantial gainful activity *by reason of* any medically determinable physical or mental impairment . . . ." *Briscoe*, 425 F.3d at 351. The social security disability benefits program is not concerned with a plaintiff's health in the abstract, but rather with the effect certain conditions have on a plaintiff's ability to engage in full-time gainful employment. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).

The plaintiff's contrary argument is unconvincing. It consists of the fact that the plaintiff from time to time wheezed (R. 253-54; 272) and from time to time complained of shortness of breath on ambulation. (R. 289; 298; 357). (*Plaintiff's Memorandum*, at 22). There is no mention of any references in the record to limitations resulting from plaintiff's diabetes, other than Dr. Riley's mention of "peripheral neuropathy" – that is, tingling in the tips of the fingers on the left hand. (R. 352). Not only is there an absence in the entire record of any conclusion or suggestion that these were disabling conditions, but the plaintiff continued smoking (R. 405), which presumably she would not have done if in fact her asthma were truly debilitating. Moreover, her continued smoking would have precluded asthma as a disabling condition. *See* 22 C.F.R. §416.930(b); *Kisling v. Chaper*, 105 F.3d 1255, 1257 (8th 1997)(failure to stop smoking in the face of repeated admonitions from her doctor).

Even Dr. Nelson, on whose March 22, 2000 report plaintiff relies, did not list asthma or diabetes as limiting plaintiff's ability to do work related activities. (R. 272). Indeed, where the form dealt with "pulmonary congestion," Dr. Nelson indicated there were no symptoms occurring with

43

ordinary physical activity and that no restrictions had been placed on plaintiff's ability to engage in physical activity. (R. 274). And, when Dr. Riley reported neuropathy, she did not indicate it was a disabling condition, but that it was based on plaintiff's complaints of "tingling in the tips of the fingers on L[eft] hand." (R. 352). This evidence does not undermine the ALJ's determination that the plaintiff can perform a limited range of light work. Phrased differently, there is substantial evidence to support the ALJ's conclusion that the plaintiff is not disabled and incapable off performing the limited range of light work specified by the ALJ.

The plaintiff also somewhat off-handedly submits that the ALJ failed to adequately consider her obesity in arriving at her RFC determination. (*Plaintiff's Memorandum*, at 23). But as with asthma or diabetes, the question is not whether, at 5'1" and 176 pounds, plaintiff is obese; it is whether her weight limits her ability to perform light work. Obesity is a condition that should not be confused with a disability. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2006). Ms. Rogers' medical records are devoid of even a suggestion that her weight had an adverse effect on her ability to work or so aggravated her other impairments as to render them disabling.

There is no indication that the ALJ failed to pay sufficient attention to whatever adverse effects plaintiff's obesity might have on her other impairments and her capacity for work; indeed, she went beyond what is required. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004)(ALJ did not err in omitting mention of applicant's obesity where it was presumably factored into doctors' reports and applicant did not explain how it "further impaired his ability to work."). It also must be noted that the plaintiff's obesity is not in anyway extreme: her Body Mass Index of 33.3 (R. 26) places her in obesity class 1, the lowest level of obesity. National Institutes of Health, The Practical Guide: Identification, Evaluation, and Treatment of Overweight and Obesity in Adults, NIH Pub.

44

No. 00-4084 (Oct.2000), p. 1, tab. 1, http://www.nhlbi.nih.gov/ guidelines/obesity/prctgd_b.pdf.
*cited in Johnson*, 449 F.3d at 807.

## The ALJ Properly Found That Plaintiff's Depression Was Not A Severe Impairment

The plaintiff testified that she was depressed about her living conditions and that she had crying spells – she experienced one during the hearing.[27] The ALJ felt that this evidence was insufficient to establish that plaintiff's depression was a severe impairment, especially since other physicians (such as Dr. Belich who found that plaintiff exhibited no signs of depression or anxiety (R. 345)) and the staff at the Haymarket Center did not find that Ms. Rogers suffered from severe depression – indeed, she denied any emotional impairment. (R. 25). Even Dr. Riley did not conclude that Ms. Rogers was suffering from clinical or severe depression, merely that her depression could affect her concentration and work. That is not enough, and, as discussed earlier, the ALJ was not tethered to Dr. Riley's opinions. *See Hofslein*, 439 F.3d at 376; *Depulveda v. Callaghan*, 1998 WL 184615 (D.P.R. 1998).

The Seventh Circuit's decision in *Wilder v. Chater* limits somewhat the strength of inferences that may be drawn from the absence of notations regarding depression in the progress notes of clinicians who treat a claimant solely for physical ailments, since they may well not be sensitive to or even competent to diagnose symptoms of depression. 64 F.3d at 337. Thus, inferences from silence in a clinician's progress notes may be perilous and cannot trump the opinion of a disinterested medical expert qualified to opine on a plaintiff's emotional condition. *Id.* at 336.

---

[27] The plaintiff testified that her living situation made her feel sad and resulted in crying spells, and it was this to which Dr. Riley had referred. (R. 99).

*Wilder* supports rather than undercuts the ALJ's conclusion in this case. The ALJ did note that Dr. Riley's treating notes never mentioned depression, and she did not refer plaintiff for psychological counseling or treatment or prescribe medication for depression. (R. 25). While the ALJ found this omission significant in light of the care and concern exhibited by Dr. Riley towards Ms. Rogers,[28] her conclusion was based on far more than this. Dr. Belich made specific note of Ms. Rogers' emotional state and the absence of any indication of depression, and the mental health professionals at the Haymarket Center concluded that Ms. Rogers was not depressed.

The Haymarket Center records bear no analytical similarity to the clinician's notes found wanting in *Wilder*. The significance of the former lie in what they say, not in what they omit, and unlike the clinicians in *Wilder* who may well have lacked any expertise in mental health problems, the staff at the Haymarket is trained to diagnose and treat mental illness. Indeed, that is the Center's mission. The Haymarket Center is:

> A 16-bed shelter is funded by the City of Chicago Department of Human Services to serve the homeless mentally ill. Detox services are available within Haymarket Center if needed. Each client is fully assessed. Medical and psychiatric services are triaged for care, and transportation is provided.

> Clients are monitored and stabilized for mental condition. A structured daily schedule is maintained, and guidance and education services provide life skill enhancements, which assist clients toward independent living.

> Case management services are provided on site. Clients assessed to be dually diagnosed receive substance abuse dependency counseling.

> Accommodations for men and women are separate. Clients share group activities including life skill counseling, meals and recreation. Self-help meetings are available daily.

---

[28] Dr. Riley referred Ms. Rogers for all manner of treatment when she felt it warranted, including eye exams, diabetic dietary instruction, transportation services, etc. (R. 352-354). It is a reasonable inference given her role as treating physician, rather than a clinician who happened to see a patient one time, that had Ms. Rogers manifested signs of severe depression, Dr. Riley would have noted it and referred her for appropriate treatment.

> A psychiatric team, consisting of a psychiatrist, a clinical psychologist, and a licensed, certified social worker assist the hands-on staff in the unit. Medication management is a core function for the program.

http://www.hcenter.org/Programs/mental.htm.

Consistent with the Haymarket Center's ultimate function, its intake forms contain a section captioned, "PSYCHIATRIC SECTION." Ms. Rogers reported that she did not have a significant past history of psychiatric problems, of receiving treatment or medicine for psychological or emotional problems, and she stated that obtaining such treatment is not important to her. The interviewer concluded that Ms. Rogers understood the questions asked, that she was honest in her responses, and that "she appears to have no need for psychological or emotional treatment at this time." Ms. Rogers stated that she was not experiencing any psychological issues at this time. (R. 413). [29] Finally, Ms. Rogers was an in-patient at the Center for 19 days, and thus the professional staff had an adequate opportunity to observe and diagnose her, which they did. They did not find that Ms. Rogers was suffering from depression, severe or otherwise. (R. 31).

## G.
### The Dictionary Of Occupational Titles Argument Comes Too Late

Finally, the plaintiff argues that the ALJ's finding at step five of the sequential analysis is not supported by substantial evidence because the jobs the ALJ found plaintiff could perform are not within the limitations of the RFC that the ALJ found the plaintiff had. (Plaintiff's Memorandum

---

[29] The plaintiff derisively suggests that the intake forms from Haymarket were signed by an "interviewer" and thus should be accorded no weight. (Plaintiff's Memorandum, at 25). There are two answers to this contention: first, the forms were co-signed by a physician. (R. 407). Second, even if it were not, the ALJ could properly conclude the staff was composed of individuals trained to carry out the Center's mission. The plaintiff and her lawyer had ample opportunity to comment on the Haymarket records; they choose to ignore them—and for obvious reasons.

at 25-26). The plaintiff argues that the *Dictionary of Occupational Titles* ("DOT") indicates that the job of hand packager is performed at a medium level of exertion, which would place it beyond the capacity of an individual limited to light work. (R. 424). She further argues that the DOT also lists certain assembly jobs as semi-skilled – again, beyond plaintiff's capacity for work – and indicates the restricted use of the non-dominant hand – which the ALJ found here – might put those jobs outside of plaintiff's limitations as well. (R. 425-26). Finally, plaintiff submits that the cashier jobs in the DOT require reading at a level above plaintiff's. (R. 427-28).

*The VE, however, testified otherwise.*

When plaintiff's counsel does not raise the issue of such discrepancies at the administrative hearing – she did not here – it is too late to do so later on. *Skarbek v. Barnhart, supra; Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *see McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004)(reaching issue where plaintiff challenged reliability of VE's conclusions at the hearing). Furthermore, the VE did indicate that the numbers of the jobs he cited represented a 50% reduction to account for plaintiff's limitations. Thus, he had arguably already considered the discrepancies the plaintiff raises.

## CONCLUSION

Cases involving review of an administrative law judge's decision denying social security benefits are often difficult: the claimants in many cases have experienced great upheavals in their lives and find themselves in unfortunate circumstances. But review of an administrative decision adverse to a claimant must give the required deference to the ALJ's conclusions where supported by substantial evidence. The Congress has determined that supplemental security income is not a

form of unemployment insurance and is unavailable if the claimant is able to work – regardless of their chances of being hired. *See, e.g., Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002); *Jones v. Shalala*, 10 F.3d 522, 526 (7th Cir. 1993). A reviewing court is not at liberty to reverse an otherwise proper decision of an ALJ merely because of the personal consequences to the claimant that may result from an ALJ's fidelity to the text and purposes of the Social Security Act. *Compare I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988); Cardozo, The Nature of the Judicial Process, 139-140 (1921); Frankfurter, *John Marshall and the Judicial Function*, Government Under Law, 31 (1956).

The ALJ's decision finding that Ms. Rogers is not disabled is supported by substantial evidence. The Commissioner's motion for summary judgment is GRANTED. The plaintiff's motion for reversal and remand is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 8/1/06